FILED
2023 Apr-18  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ALEXIA ADDOH-KONDI, CYNTHIA BONNER, JA'NELLE BROWN, ERIC HALL, MICHAEL HANSEN, JULIA JUAREZ, CHARLES LONG, WILLIAM MUHAMMAD, FRED LEE RANDALL, TAMMIE SMITH, and ROBERT WALKER,** | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| **vs.** | ) ) |
| **THE JEFFERSON COUNTY COMMISSION; a political subdivision of the State of Alabama; STEVE AMMONS, T. JOE KNIGHT, LASHUNDA SCALES, JAMES A. STEPHENS, and SHELIA TYSON, in their official capacities as members of the Jefferson County Commission,** | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**COMPLAINT**

1.    The districts adopted by the Jefferson County Commission Resolution No. 2021-929, on November 4, 2021, are racially gerrymandered and violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

1

2.    Plaintiffs in this action agree with the complaint filed recently by the NAACP and others that the Commission unnecessarily packed Black voters in Districts 1 and 2 and diluted their voting strength. *McClure v. Jefferson County Comm'n*, CA No. 2:23-cv-00443-NAD.  But the *McClure* complaint focuses more on reducing the size of the large Black majorities in Districts 1 and 2, while the instant complaint focuses more on the need to restore traditional districting principles, in particular protecting the integrity of municipal boundaries. This complaint demonstrates that eliminating the split municipalities in the enacted plan would yield racially fair Commission districts without the need to engage in race-conscious line drawing.

3.    From 1931 to 1985 the Jefferson County Commission consisted of three Commissioners, all of whom were elected at large.  The number of Commissioners and the method of election changed in 1985 to five single-member districts pursuant to a federal court Consent Decree in *Taylor v. Jefferson County Comm'n*, No. 84-C-1730-S (N.D. Ala. Oct. 31, 1985).

4.    In order to remedy a well-established history and pattern of racial discrimination in voting, the initial districts were drawn to create two majority-Black and three majority-White districts. Blacks were 33% of Jefferson County's population in the 1980 census, and Districts 1 and 2 were drawn at 65.6% Black and 66.8% Black

allegedly to provide Black voters a greater opportunity to elect candidates of their choice and to comply with Section 2 of the Voting Rights Act. Achieving Black majorities greater than 65% required splitting many municipal and precinct boundaries in 1985.

5. The first elections in the 1985 single-member districts were held in the June 1986 primary and November 1986 general elections. These race-conscious districts were adjusted to restore population balance after the 1990, 2000, and 2010 censuses to avoid retrogression that might have violated Section 5 of the Voting Rights Act.

6. But after *Shelby County v. Holder*, 570 U.S. 529 (2013), Jefferson County was no longer required to comply with Section 5. Therefore, in 2021 the Commission could not rely on the Voting Rights Act to justify splitting municipal boundaries along racial lines when districts not based on race provide Black voters an opportunity to elect candidates of their choice in at least three districts. *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022); *Cooper v. Harris*, 137 S. Ct. 1455 (2017).

7.     No consideration was given to creation of a plan drawn according to traditional districting principles not based on race.  And because the Black population of Jefferson County has increased from 33.3% in the 1980 Census to 42.5% Black in the 2020 Census, the racially packed districts in the 2021 plan prevent the formation of either a third majority-Black district or one or more "crossover" districts, that is, districts in which less than a Black majority can combine with reliable White voter support to elect candidates favored by Black voters.

8.     The 2021 redistricting plan violates traditional districting criteria by unnecessarily splitting along racial lines 25 Census Designated Places, including 23 of the 34 incorporated municipalities in Jefferson County.  See Appendix G to this Complaint for a list of incorporated Jefferson County municipalities.

9.     This action is brought to seek enforcement of the Equal Protection principles established by *Shaw v. Reno*, 509 U.S. 630 (1993), and its progeny, which prohibit the sorting of voters by race unless it can be justified by the need to comply with the Constitution and/or the Voting Rights Act.  A plan that restores the integrity of municipal boundaries could produce at least three districts which provide Black voters an opportunity to elect candidates of their choice and thus would satisfy the Voting Rights Act without engaging in race-conscious redistricting.

10.     Plaintiffs' racial gerrymandering cause of action is not a claim of

intentional discrimination. It is not based on the disparate treatment of voters that results in racial vote dilution, even though the two packed majority-Black districts dilute Black voting strength. Rather, it is based on the unique Equal Protection jurisprudence first announced in *Shaw v. Reno* that prohibits classifying voters on the basis of race for any reason, good, bad, or indifferent, absent a compelling state interest. The unjustifiable separation of Black and White voters based on their race causes what the Supreme Court has called an "expressive harm," that is, one that "results from the idea or attitudes expressed through a governmental action, rather than from the more tangible or material consequences the action brings about." *Bush v. Vera*, 517 U.S. 952, 1053-54 (1996) (citation omitted). This expressive harm injures all voters in the gerrymandered districts, regardless of their race.

11. By requiring adherence to the traditional redistricting principle of aggregating political subdivisions, this Court can remedy the existing racial gerrymanders and restore a measure of rationality and fairness to Jefferson County's redistricting process. Protecting the integrity of municipal boundaries will advance the fair representation of all citizens of Jefferson County.

## JURISDICTION AND VENUE

12. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357 to enforce the rights of Plaintiffs alleged herein

secured by the Fourteenth Amendment of the Constitution of the United States, and for which judicial relief is provided by 42 U.S.C. §§ 1983 and 1988.

13.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b).

## PARTIES

15.    Plaintiff ALEXIS ADDOH-KONDI is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 1.

16.    Plaintiff CYNTHIA BONNER is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 4.

17.    Plaintiff JA'NELLE BROWN is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 3.

18.    Plaintiff ERIC HALL is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County, residing in Jefferson County Commission District 1.

19.    Plaintiff MICHALE HANSEN is a White citizen of the United States and

the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 1.

20.     Plaintiff JULIA JUAREZ is a White citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 1.

21.     Plaintiff CHARLES LONG is a White citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 5.

22.     Plaintiff WILLIAM MUHAMMAD is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 1.

23.     Plaintiff FRED LEE RANDALL is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 2.

24.     Plaintiff TAMMIE SMITH is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson County Commission District 1.

25.     Plaintiff  ROBERT WALKER is a Black citizen of the United States and the State of Alabama who is a registered voter in Jefferson County residing in Jefferson

County Commission District 1.

26.     Defendant JEFFERSON COUNTY COMMISSION is the governing body of Jefferson County, the most populous county in Alabama. Its members are elected from five single-member districts, the boundaries of which must be redrawn by resolution adopted by the Commission following the release of any federal decennial census. Ala. Code § 11-3.1.1.

27.     Defendant LASHUNDA SCALES is the duly elected Commissioner representing District 1 of the Jefferson County Commission. Defendant Scales is sued in her official capacity. Commissioner Scales resides in the Huffman neighborhood of Birmingham.

28.     Defendant SHELIA TYSON is the duly elected Commissioner representing District 2 of the Jefferson County Commission. Defendant Tyson is sued in her official capacity. Commissioner Tyson resides in the West End neighborhood of Birmingham.

29.     Defendant JAMES A STEPHENS is the duly elected Commissioner representing District 3 of the Jefferson County Commission. Defendant Stephens is sued in his official capacity. Commissioner Stephens resides in Bessemer.

30.     Defendant T. JOE KNIGHT is the duly elected Commissioner representing District 4 of the Jefferson County Commission. Defendant Knight is

8

sued in his official capacity. Commissioner Knight resides in Trussville.

31.     Defendant STEVE AMMONS is the duly elected Commissioner representing District 5 of the Jefferson County Commission. Defendant Ammons is sued in his official capacity. Commissioner Ammons resides in Vestavia Hills.

## ALLEGATIONS OF FACT

32.     From 1931 until 1985, the Jefferson County Commission consisted of three Commissioners elected in the county at large. The 1985 Consent Decree, as amended, settled claims that the at-large method of election violated Section 2 of the Voting Rights Act. It required the Commissioners to be elected from five single-member districts. In 2004, the Alabama Legislature adopted the *Tayor* Consent Decree as the law of Alabama. Ala. Code § 45-37-72.

33.     The Amended 1985 Consent Decree purposefully created two districts that were over 65% Black in total population. District 1 was 65.6% Black, and District 2 was 66.8% Black. At that time, because Black registration rates and turnout rates historically had been low, it was generally thought that 65% Black districts were needed to provide Black voters an equal opportunity to elect candidates of their choice. However, the registered voter lists appended to Jefferson County's Section 5 submission to DOJ shows that, as of August 1985, Blacks were 66.0% and 69.3% of the registered voters in Districts 1 and 2 respectively. The submission letter, signed by

9

the County Attorney, says these two districts "are drawn in order to provide blacks with a greater opportunity to elect black commissioners."

34.    To reach and exceed the 65% majority-Black targets many precincts had to be divided.  "[T]he parties through their attorneys have informed the Court that variations between the precincts - boxes and the Commission districts in the Consent Decree were more extensive than the parties realized but that they have agreed to a modification."  Amended Consent Decree, Nov. 1, 1985, at 1.  The Commission districts also split five municipalities in addition to Birmingham: Tarrant, Fairfield, Gardendale, Irondale, and Fultondale.

35.    Maps of the 1985 Consent Decree districts are attached as Appendix A to this Complaint.  According to the County's submission to the Department of Justice under Section 5 of the Voting Rights Act, the White and Black populations of the five districts, based on 1980 census data, were as follows:

| District | Total | White | % White | Black | % Black | Other |
|---|---|---|---|---|---|---|
| 1 | 136,172 | 46,134 | 33.9% | 89,352 | 65.6% | 686 |
| 2 | 134,678 | 44,266 | 32.9% | 89,980 | 66.8% | 432 |
| 3 | 132,677 | 102,936 | 77.6% | 29,419 | 22.2% | 322 |
| 4 | 136,827 | 129,452 | 94.6% | 6,813 | 5.0% | 562 |
| 5 | 130,843 | 121,511 | 92.9% | 8,195 | 6.3% | 1,137 |
| Totals | 671,197 | 444,299 | | 223,759 | | 3,139 |

36.  The 1990, 2000, and 2010 Censuses showed that the overall population of Jefferson County had declined from its 1985 level of 671,324.  But this was due to declines in White population.  The Black population steadily increased.  The 1990 Census shows a total population of 651,525 with a Black population of 228,521 (35.07 %) and a White population of 418,317 (64.20 %).  The 2000 Census shows a total population of 662,047 with a Black population of 260,608 (39.36 %) and a White population of 384,639 (58.09 %).  Finally, the 2010 Census shows a total population of 658,466 with a Black population of 280,083 (42.5 %) and a White population of 355,041 (53.9 %).

37.  Notwithstanding these changing demographics, the redistricting plans for the Jefferson County Commission adopted after the 1990, 2000, and 2010 Censuses all perpetuated the two super-majority-Black districts and three majority-White established in the 1985 plan.  The size of the Black majorities in Districts 1 and 2 were purposefully maintained at or above 65% based in part on the mistaken belief this was necessary to avoid retrogression that violated Section 5 of the Voting Rights Act.  "Section 5 ... does not require a covered jurisdiction to maintain a particular numerical minority percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 275 (2015).

38.  A map of the Jefferson County Commission districts enacted after the

11

2000 Census is attached to this Complaint as Appendix B.

39.     A map and statistics for post-2010 Census redistricting plan is attached to this Complaint as Appendix C. The statistics display populations of the districts based on the 2020 census, not the 2010 census. These were the data the Commission began with to produce the 2021 plan. They show that the total population of Jefferson County had increased from 658,466 in the 2010 census to 674,721 in the 2020 Census, that majority-Black Districts 1 and 2 were underpopulated, and that majority-White Districts 3, 4, and 5 were overpopulated.

40.     But since 2010 non-Hispanic White population had dropped from 340,213 to 324,252.  It was Black residents who drove much of the increase in total population, rising from 280,083 in 2010 to 289,515 in 2020. And, because the Black population in 2020 was more geographically dispersed than it was in 1985, in 2020 they made up 30.06%, 32.46%, and 14.27% of majority-White Districts 3, 4, and 5, a dramatic increase from 22.2%, 5.0%, and 6.3% in 1985.

41.     By 2020 Blacks constituted 78.3% and 69.01% of Districts 1 and 2 in the 2011 plan. To reach the size of these Black majorities, the 2011 plan had split ten municipalities in District 1 and seven municipalities in District 2.  Among all five 2011 districts a total of 22 Census places had been split, most of which were incorporated municipalities, a vast increase over the six municipalities (including

Birmingham) originally split in the plan embodied in the 1985 Consent Decree.

42.    The fact that, as of the 2020 census, the 2011 plan split only one precinct, Oxmoor Valley Community Center, is misleading.  That is because the Commission has exclusive statutory authority to modify precinct boundaries, and the precincts that were split by the 2011 plan have been redrawn as new whole precincts.  Ala. Code § 17-6-2.

43.    The redistricting plan adopted by the Commission after the 2020 Census continues to perpetuate the two super-majority-Black and three majority-White racial gerrymanders in the 1985 plan.  See Appendix D to this Complaint.

44.    Even though their substantial under-populations required extending their geographic boundaries, the 2021 plan maintains majorities of Black residents at 78.27% in District 1 and 66.18% in District 2.  And the Black percentages in two of the majority-White districts actually dropped, from 30.06% to 27.29% in District 3 and from 32.46% to 28.45% in District 4.  The Black population of District 5 stayed the same at 14%.

45.    To achieve this severe racial gerrymandering, the 2021 redistricting plan increases the number of split census places from 22 to 25, all but three of which (Grayson Valley, McDonald Chapel, and Mount Olive) are incorporated municipalities. Nineteen of those divided census places are in majority-Black Districts 1

and 2.  See page 7 of 14 in Appendix D.  The 2021 plan also splits 52 of the 120 precincts in Jefferson County.

46.    Almost any race-neutral plan that preserves the integrity of municipal boundaries in Jefferson County, except for Birmingham, and which meets a maximum deviation of 10% - which the Supreme Court says is permissible, *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 259 (2015) - will yield at least three districts that combine one or more majority-Black districts with one or more effective crossover districts.  Such a race-neutral plan will comply with Section 2 of the Voting Rights Act, making any race-conscious drawing unnecessary.  The following are two examples of plans, drawn without reference to race, that minimize municipal splits between districts.

47.    Illustrative Plan 1a is attached as Appendix E to this Complaint. It has a maximum population deviation between the largest and smallest districts of 1.05%, which is less than the 2% maximum deviation constraint arbitrarily adopted by the Jefferson County Commission and less than the 1.72% overall deviation in the enacted 2021 plan. Yet it splits only three municipalities in addition to Birmingham (which is too populous to be kept whole), Irondale, Vestavia Hills, and Hoover. Noncontiguous municipal boundaries account for the small pieces of Irondale and Hoover placed in Commission District 4.  Only Vestavia Hills has contiguous population that is split

14

between Districts 1, 4, and 5, splits needed to keep the maximum deviation of Plan 1a below 2%.

48.    Illustrative Plan 1a produces Black total population majorities of 64.19% and 64.57% for Districts 1 and 2 and a slight Black majority of 50.24% for District 3. However, the District 3 Black voting-age population is 48.51%, and the Black voting-age majorities in Districts 1 and 2 are 60.55% and 63.56%.

49.    The integrity of Vestavia Hills is restored in Illustrative Plan 1b, attached as Appendix F to this Complaint. This required increasing the maximum deviation in the plan to 8.30%, well within the Supreme Court's 10% deviation standard.  So it splits only two municipalities in addition to Birmingham (which is too populous to be kept whole), Irondale and Hoover, again, only because they have small noncontiguous parts.

50.    Illustrative Plan 1b produces Black total population majorities of 64.42% and 64.53% for Districts 1 and 2 and a slight Black majority of 50.24% for District 3. But their Black voting-age populations drop to 60.79%, 63.52%, and 48.51%.

51.    Illustrative plans 1a and 1b, which are drawn according to traditional redistricting principles without reference to race, would provide Black voters an equal opportunity to elect candidates of their choice in three Commission districts.

## COUNT I

### Racial Gerrymandering in Violation of the
### Equal Protection Clause of the Fourteenth Amendment

52.    Paragraphs 31 through 51 *supra* are realleged as if set out fully herein.

53.    The redistricting plan adopted by Resolution No. 2021-929 is racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment.

54.    Racial gerrymandering is unconstitutional when traditional redistricting principles have been subordinated to racial considerations in ways that do not satisfy a narrowly tailored, compelling state interest. E.g., *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015). "If District lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because 'race-based decision-making is inherently suspect.'" *Rucho v. Common Cause*, 139 S. Ct. at 2502 (citing *Miller v. Johnson*, 515 U.S. 900, 915 (1995); *Bush v. Vera*, 517 U.S. 952, 959 (1996) (principal opinion)).

55.    There is a two-step analysis for proving an unconstitutional racial gerrymander. "At the first step, the plaintiff must prove 'race was the predominant factor motivating the [Commission's] decision to place a significant number of voters within or without a particular district.'" *Jacksonville Branch of the NAACP v. City of Jacksonville*, 2022 WL 16754389 at *1 (11th Cir., Nov. 7, 2022) (quoting *Cooper v.*

*Harris*, 137 S. Ct. 1455, 1463 (2017) (additional citations omitted). Where the Commissioners' intent has been "to maintain the race-based lines created in the previous redistricting cycle, [t]he Supreme Court has been ... clear that this is not a legitimate objective." *Jacksonville Branch of the NAACP,* 2022 WL 16754389 at *3 (citing *North Carolina v. Covington*, 138 S. Ct. 2548, 2551 (2018) (per curiam)).

56. Inconsistency with traditional redistricting criteria is not a threshold or mandatory requirement for proving that the enacted plan is a racial gerrymander. There may be other compelling direct or circumstantial evidence that race was the predominant factor. But, "as a practical matter, in many cases, perhaps most cases, challengers will be unable to prove an unconstitutional racial gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 190-91 (2017). In the instant case there are both direct evidence that the Commissioners intended to preserve the racial design of their districts initiated in 1985 and to disregard traditional redistricting criteria.

57. The direct evidence of racial predominance is the undisputed failure of the Commission to consider whether the race conscious design and target populations of the 1985 Consent Decree were still needed and the Commission's admitted policy of maintaining the 1985 districts with Black and White majorities, allowing the incumbents

17

to choose as much as practicable the movement of precincts in and out of their districts to adjust for population imbalances. The incumbents invariably negotiated to retain or increase in their district's residents of their own race.

58.    This direct evidence is supported by the enacted plan's disregard of traditional districting principles, especially respect for the integrity of municipal boundaries. Keeping political subdivisions whole within districts is the traditional districting principle most frequently cited by the Supreme Court. E.g., *Bush v. Vera*, 517 U.S. at 959-60 ("traditional redistricting principles such as natural geographical boundaries, contiguity, compactness, and conformity to political subdivisions"); *id.* at 962-63 ("many incumbent protection boundaries sabotaged traditional redistricting principles as they routinely divided counties, cities, neighborhoods, and regions"); *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016) ("we have made clear that in addition to the traditional districting principles such as compactness [and] contiguity, *Shaw v. Reno*, 509 U.S. 630, 647 (1993), those legitimate considerations can include a state interest in maintaining the integrity of political subdivisions") (citing *Shaw v. Reno*, 509 U.S. at 647; *Mahan v. Howell*, 410 U.S. 315, 328 (1973) (cleaned up)); *Vieth v. Jubelirer*, 541 U.S. 267, 272–73 (2004) (the challenged plan allegedly "ignor[ed] all traditional redistricting criteria, including the preservation of local government boundaries"); *Abrams v. Johnson*, 521 U.S. 74, 84–

85 (1997) (the district court's remedial plan properly relied on Georgia's traditional districting principles based on maintaining political subdivisions such as counties and cities").

59.    The redistricting plan adopted in 2021 splits the boundaries of two dozen municipalities in Jefferson County. Most of these split cities are divided along racial lines between majority-Black Districts 1 and 2 and majority-White Districts 3, 4, and 5. Such transgressions of arguably the most important traditional principle is completely unnecessary and cannot be explained on any basis other than race.

60.    Once plaintiffs satisfy the first step, the second step of the racial gerrymandering analysis requires the Commission to bear the burden of showing that the enacted plan's racial design withstands strict scrutiny. *Jacksonville Branch of the NAACP,* 2022 WL 16754389 at *3 (citing *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022)).

61.    The Defendants cannot carry their burden, because they never considered alternative plans drawn using traditional redistricting criteria without reference to race before simply adjusting population imbalances in the 2011 racial gerrymander.  Had they done so they would have found that almost any reasonable plan that restores the integrity of municipal boundaries would create at least three districts that provide Black voters an effective opportunity to elect candidates of their choice.

In the illustrative plans above, even if one or more of those opportunity districts contains less than a Black voting-age majority, there is sufficient reliable crossover White voting to elect the choice of Black voters.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

That this Court will expedite a trial on the merits and render a decision in time for constitutional, non-discriminatory Jefferson County Commission districts to be used in future elections.

That the Court require Defendants to respond promptly to the claims set out herein, authorize required discovery to commence immediately, schedule a trial on the merits as soon as practicable, and provide relief as follows:

A.   Enter a declaratory judgment that the Jefferson County Commission's redistricting plan, adopted in 2021 by Resolution No. 2021-929 is racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.

B.   Issue a permanent injunction prohibiting implementation of Resolution No. 2021-929 in future elections of the Jefferson County Commission.

C.   Require Defendants to promptly adopt a remedial redistricting plan that complies with the Constitution and laws of the United States and the State of

Alabama; and, should Defendants fail to do so, require implementation of a Court-ordered redistricting plan.

    D.   Award Plaintiffs their reasonable attorneys' fees and expenses.

    E.   Grant such other and further relief as the Court may deem just and equitable.

/s/ *Richard P. Rouco*
Richard Rouco
Counsel for Plaintiffs
2 – 20th Street North
Suite 930
Birmingham, AL 35203
Tel.   (205) 870-9989
Fax.   (205) 803-4143
rrouco@qcwdr.com

*/s/ James Uriah Blacksher*
James Uriah Blacksher
825 Linwood Road
Birmingham, AL 35222
Tel: (205) 612-3752
Fax: (866) 845-4395
jublacksher@gmail.com

/s/U.W. Clemon
U.W. Clemon, LLC
2001 Park Place North, Tenth Floor
Birmingham, AL 35203
Tel: (205) 506-4524
Fax: (205) 538-5500
uwclemon1@gmail.com

/s/ *Richard Rice*
The Rice Firm, LLC
115 Richard Arrington Jr. Blvd. N.
Birmingham, AL 35203
Mailing Address - Post Office Box 453
Birmingham, AL 35201
Tel. (205) 618-8733 ext. 101
Fax. (888) 391-7193
rrice@rice-lawfirm.com